ELECTRONICALLY FILED
Pulaski County Circuit Court
Larry Crane, Circuit/County Clerk
2017-Oct-10 17:05:47
60CV-17-5716
C06D12 : 10 Pages

## IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS

JESSICA HILL

**PLAINTIFFS**

VS.                                    CASE NO: _____

ARKANSAS CHILDREN'S
HOSPITAL and RACHEL
CLINGENPEEL MD, individually                    **DEFENDANT**
and in her official capacity.

## COMPLAINT

COMES PLAINTIFF, by and through Counsel and for this Complaint states:

### PARTIES AND JURISDICTION

1.      Jessica Hill is a resident and citizen of the State of Arkansas, whose children were seized by Arkansas Children's Hospital, in Pulaski County, Arkansas in 2015.  Arkansas Children's Hospital is a private entity acting as the county hospital for Pulaski County, Arkansas who acted under the authority granted it by Title 18 of Ark. Code Ann. § 12-18-101 et seq. cited as "The Arkansas Child Maltreatment Act". and is sued for its Due Process violations, as allowed by 42 USC 1983 and the ACRA. Defendant Dr. Rachel Clingenpeel MD. submitted the false Affidavit attached as Exhibit "A." Plaintiff also sues for Declaratory Judgment.  Accordingly, this Court has subject matter jurisdiction.  Venue is proper, since the acts giving rise to this action arose in Pulaski County, Arkansas.  All actions were taken under color of state law.

### GENERAL ALLEGATIONS OF FACTS

2.      Plaintiff has three (3) children and is a fit mother.

3.      Plaintiff presented in labor without spontaneous rupture of membranes at full term on 6/10/15.

4.      Plaintiff had one previous birth by C-section and Plaintiff elected to have repeat C-section.

5.    Plaintiff delivered an apparently healthy 7 lb 6 oz girl

6.    Plaintiff was prescribed Oxycodone with acetaminophen (Percoset) for post-operative pain.

7.    Plaintiff was discharged and filled a prescription for Oxycodone on 6/12/15.

8.    Maddison's discharge summary says the mother plans to breast feed.

9.    Plaintiff had gallbladder surgery and fill another prescription for Oxycodone on 7/31/15.

10.    The pediatrician's office records show three visits by Maddison Childress, 7 days, 7 weeks, are 9 weeks after birth.  The records reflect:

    a.  At 7 days, it says the mother is breast feeding

    b.  At 7 weeks, Plaintiff's baby is spitting up and they have added soy formula

    c.  At 9 weeks, two days before Plaintiff went to the emergency room, so was vomiting, waking up in the middle of the night and was fussy

    a.  The results of a hair drug test on Maddison Childress done on August 18, 4 days after Plaintiff went to the hospital reflect drug exposure both before birth, and since including from breast milk.

    b.  The test was positive for cannabinoid because there was a history of smoking marijuana until Plaintiff knew she was pregnant, at which time she  stopped. .

11. Further, medication records from her hospital stays for the birth and the gallbladder surgery show that Plaintiff was given oxycodone after her C-section and hydrocodone after her gallbladder surgery.

12. Results from the hair test show with regard to exposure to opioids that Plaintiff's baby was exposed to oxycodone and hydrocodone but the level of hydrocodone is

20 time less than oxycodone. Which may be consistent with her being exposed by her mother's breast milk, or a false + by possible bleed over from the oxy.

13. The consult notes of Dr. Clingenpeel that Plaintiff wrote after the drug test results were known. "The hair test results demonstrate that Maddison has been in a drug-exposed environment, which in addition to her recent abusive head injury is another source of concern for her safety, as children in drug-endangered environments are at risk for multiple forms of child maltreatment."

14. Exposure to oxycodone and hydrocodone was as prescribe by Jessica Hill's doctors and does not reflect an illicit use or have any harmful effect on her daughter, Maddison. Dr. Clingenpeel would have known as much if Plaintiff had reviewed Jessica Hills medical records, or taken a competent history.

   a. The use of marijuana is less dangerous than smoking tobacco. Women who smoke cigarettes while pregnant are at risk for having low birth weight babies. Those who smoke marijuana are not.

   b. In her second note, Dr. Clingenpeel states "It is noted that no history of breastfeeding was provided during the dietary history obtained during Maddison's recent hospitalization", which again reflects Dr. Clingenpeel not properly reviewing the medical records.

   c. The second note also states "If the medications were directly administered to Maddison, that would be a highly dangerous and potentially fatal source of exposure. If Maddison's positive hair test for opiates was a result of prenatal or postnatal maternal use of these drugs, unless mother had a valid prescription for these medications, her use of them would be consistent with

maternal substance abuse, which would place Maddison at risk as previously described."

d. Dr. Clingenpeel intentionally tried to put these tests in the worst possible light. There is no other reasonable explanation for failing to take a competent history or failing to review readily available and relevant medical records while investigating suspected abuse. Jessica Hill followed her doctor's orders and took these pain medications as prescribed and as directed, yet this evidence is wholly ignored by the investigating doctors of the Child at Risk Team and in the place of evidence is a description of abusive behavior that is contrary to Plaintiff's behaviors which were proven conclusively by readily available evidence contained in Plaintiff's medical records. .

15. ACH submitted the form for reporting suspected child abuse supported by two EEG reports, and a neurology consult note.

16. The records reflect:

a. while attempting to place a PIV [peripheral IV] nurse notice seizure like activity, as Plaintiff's baby developed a fixed gaze and began twitching, did not respond to pain. This episode lasted around 60 seconds and resolved spontaneously;

b. About 45 minutes later Plaintiff's baby began seizing again, as her left arm and leg began twitching with fixed gaze. This episode was witnessed by Dr. Willis. This episode lasted about 12 minutes and resolved with Ativan;

c. Two long term EEG examinations, one lasting 24 hours another lasting 8 hours, showed no evidence of a seizure.

    d. Plaintiff's baby was given anti-seizure medications, which were weaned after 4-6 weeks but never had another episode.

    e. Plaintiff's baby probably had a seizure but it was not confirmed. Plaintiff's baby never had another one.

17. Defendant caused Plaintiff's children to be taken on 8-15-15 without any basis in fact or law.   Maddison was not abused in any way, and there was no clinical evidence supporting abuse from shaking her.   However, Defendant submitted the Affidavit attached as Exhibit "A."

18. Defendant Rachel Clingenpeel MD. Knowingly submitted a false Affidavit is false in the following respects:

    a. The "Retinal Hemorrhages" were never diagnosed by the ophthalmology department, (as is stated by Clingenpeel) but rather by a resident, whose diagnosis upon review by the actual attending physician were deemed not accurate.

    b. There was no evidence of "seizures" whatsoever during the 48 hour test, only a Doctor's subjective statement of a single "seizure-like movement" during insertion of a catheter.

    c. Clingenpeel's matter-of-fact accusations of abuse are false, as that statement is not supported by the evidence herein. The fact that Clingenpeel based abuse (Keep in mind she did not consult Ophthalmology, the attending Ophthalmologist, Dr. Rook, even stated that she could not understand why Dr. Clingenpeel made abuse findings without first consulting Ophthalmology Dept) upon diagnoses of retinal hemorrhages and seizures that are not supported by the record.

19. The probable cause hearing occurred 11 days later on 8-26-15. This was a denial of Due Process.

20. In an attempt to gain an advantage in the civil proceedings Plaintiff was subsequently charged with a crime, resulting in stigmatization in the community being faced with charges that carried a potential life sentence.

21. The charges were later Nolle Prossed.

22. Plaintiff demanded a name clearing hearing and submitted a FOIA request, attached as Exhibit "A."

23. ACH denied both requests.

COUNT I

24. Plaintiff realleges the foregoing as if fully set out herein.

25.     As matter of official policy or custom, Defendant routinely seizes American citizen's children and holds them for more than 72 hours without making sure the Court is notified.

26.     Hundreds of citizens and their children have been subjected to this practice within the past three years.  Due process requires a prompt post-deprivation hearing.  Swipies v. Kofka, 419 F.3d 709, 2005 U.S. App. LEXIS 16861

27.     Despite warning, Defendant's employer refuses to ensure that American citizens receive a prompt judicial appearance, in effect creating a Star Chamber.

28.     Defendant is responsible for insuring citizens like Plaintiff receive a prompt judicial appearance, after their children are seized.

29.     However, the policy, custom, and training of ACH, allows Defendant to do exactly what happened in this case.

30.     A timely hearing would have prevented the extended infringement on their familial rights.

31.     Plaintiff did not receive a timely hearing.

32.     Plaintiff is guaranteed due process of law pursuant to the Fourteenth Amendment to the United States Constitution. The Fourteenth Amendment provides, in relevant part, "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, sec. 1. Plaintiff brings claims for violations of both substantive and procedural due process.

33.     Substantive due process rights are those rights which are "fundamental" under the Constitution. The United States Supreme Court has recognized a "fundamental liberty interest of natural parents in the care, custody, and management of their child" protected by the Fourteenth Amendment. Miller v. City of Philadelphia, 174 F.3d 368, 374 (3d Cir. 1999)(quoting Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-1395, 71 L.Ed.2d 599, 606 (1982)).

34.     "The touchstone of due process is the protection of the individual against arbitrary action of government." Miller, 174 F.3d at 374 (internal quotations omitted). To incur liability, the objective character of the government action must be so egregious that it "shocks the conscience". Miller, 174 F.3d at 375.

35.     Specifically, the Third Circuit has held that child welfare workers abridge an individual's substantive due process rights where their actions "exceed both negligence and deliberate indifference, and reach a level of gross negligence or arbitrariness that indeed 'shocks the conscience.'" Miller, 174 F.3d at 375-376. The Third Circuit, in explaining Miller, held that in order for a child welfare worker to be liable for removing a child from his parents upon suspicions of abuse, the worker must have "consciously disregarded a great risk that there had been no abuse." Ziccardi v. City of Philadelphia, 288 F.3d 57, 66 (3d Cir. 2002).   Here, Defendant consciously disregarded a great risk that there had been no abuse.

36.     To state a Section 1983 claim for deprivation of procedural due process, plaintiff must allege that: (1) they were deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty or property; and (2) the procedures available

did not provide due process of law.   To state a Section 1983 claim for deprivation of procedural due process, plaintiffs must allege that: (1) they were deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty or property; and (2) the procedures available did not provide due process of law. Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000). Regarding the first requirement, as discussed above, parents have a constitutionally cognizable liberty interest in the care, custody, and management of their children. Miller, 174 F.3d at 374.   Regarding the procedures available, "the fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Id. at 373 (internal quotations omitted).

37.       Regarding the first requirement, as discussed above, parents have a constitutionally cognizable liberty interest in the care, custody, and management of their children. Miller, 174 F.3d at 374. Regarding the procedures available, "the fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Id. at 373 (internal quotations omitted).   Plaintiff has been denied the opportunity to be heard at a meaningful time and in a meaningful manner, and there is no adequate remedy at law because the state statutes are unconstitutional to the extent they allow more than 72 hours for a post-deprivation hearing.

38.       Defendant in her official capacity had a duty to ensure that Plaintiff received a prompt post-deprivation hearing within 3 days.  But she failed.  It was within her power to provide Plaintiff a prompt post-deprivation hearing, but she failed.

39. ACH is a state actor by virtue of its status as the County Hospital and its invocation of Title 18 of Ark. Code Ann. § 12-18-101 et seq. cited as "The Arkansas Child Maltreatment Act," as recognized in Lugar and its progeny.

40. ACH, acting according its policy and practice, seized Plaintiff's children and deprived her of custody, then failed to provide her post-deprivation process required by both the US and Arkansas Constitutions.

41. Plaintiff also had a vested property right in her reputation.   However, ACH caused negative and false information to be published in the media.   This misinformation stigmatized the Plaintiff in the community sufficient to invoke her right to a name clearinghearing.

42. Plaintiff demanded a name-clearing hearing.

43.      As a result of the deprivation of Plaintiff's state and federal constitutional rights, Plaintiff and her family have experienced severe mental and emotional distress such that Plaintiff pleads for appropriate compensatory and punitive damages against Defendant in her individual capacity.

COUNT II

44. Plaintiff submitted an FOIA to ACH, but ACH refused the request.

45. Plaintiff is entitled to Declaratory Judgment that ACH is the county hospital and subject to the FOIA, as well as establishing that ACH has violated the FOIA.

COUNT III

46. Plaintiff realleges paragraphs 1-21 as if fully set out herein.

47. ACH caused a criminal proceeding to be filed against the Plaintiff without probable cause in order to generate money.   This is an improper purpose. Doctors for the "Team for Children At Risk" are ordering medical testing on infants and children to procure evidence for prosecutions of the criminal code, and of the maltreatment act, rather than treating the children. In the case at bar, the "Life threatening injuries" required no medical treatment at all, yet the child underwent 100's of xrays and other imaging including being injected with radioactive materials for contrast. The child underwent no surgery, therapy, or any other treatment for injuries. She was taken from her parents and discharged to a foster family.

48. Interestingly, the child's third foster family took the her to the ER at childrens with exactly the same symptoms in November of 2015 as when the Parents first brought her in August of 2015, yet when the foster parents brought her in, not a single image, or x-ray, or CT scan or MRI or ANY OTHER test was performed on the child in November, despite the exact same symptoms.

49. As a result, ACH has committed the tort of abuse of process and malicious prosecution.

50.    As a result of the frivolous filing of criminal charges, Plaintiff and her family have experienced severe mental and emotional distress such that Plaintiff pleads for appropriate compensatory and punitive damages against Defendant in her individual capacity.

WHEREFORE Plaintiff prays for an Order certifying the class described above, for appropriate compensatory and punitive damages exceeding one million dollars, for a trial by jury, for reasonable attorney's fees, for costs, and for all other proper relief.

Respectfully submitted,

SUTTER & GILLHAM, P.L.L.C.
Attorneys at Law
P.O. Box 2012
Benton, AR 72018
501-315-1910 Office
501-315-1916 Facsimile
Attorney for the Plaintiff

By:    /s/ Luther Oneal Sutter
Luther Oneal Sutter, AR Bar No. 95031
luthersutter@yahoo.com